# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Newport News Division

JUANITA D. J.,[1]

        Plaintiff,

v.                                    ACTION NO. 4:22cv64

COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,

        Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Juanita J. filed this action for review of a decision by the Commissioner of the Social Security Administration ("Commissioner") denying her claim for a period of disability and disability insurance benefits and Supplemental Security Income benefits under Titles II and XVI of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

An order of reference assigned this matter to the undersigned. ECF No. 9. It is recommended that plaintiff's motion for summary judgment (ECF No. 13) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 14) be **GRANTED**.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons. Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

## I.     PROCEDURAL BACKGROUND

In February 2020, Juanita J. ("plaintiff") protectively filed a Title II application for disability insurance benefits and a Title XVI application for Supplemental Security Income, alleging disability from February 24, 2020. R. 192–206. On July 7, 2020, plaintiff amended her application to state a disability onset date of February 24, 2019. R. 207. Plaintiff alleged disability due to chronic depression, vitamin C and D deficiency, chronic anemia, essential hypertension, chronic, low left-side back pain, vertigo, and chronic migraine headaches. R. 56–57, 68–69. Following the state agency's denial of her claim, both initially and upon reconsideration, R. 56–79, 132–37, plaintiff requested a hearing before an administrative law judge ("ALJ"), R. 138–40. ALJ Maryann S. Bright held a hearing on December 2, 2021, and issued a decision denying benefits on February 8, 2022. R. 11–24, 29–55. On June 23, 2022, the Appeals Council denied plaintiff's request for review of the ALJ's decision. R. 1–5. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

With her administrative remedies exhausted, plaintiff, acting without an attorney, filed a complaint with the Court on September 16, 2022. ECF No. 3. Along with her complaint, plaintiff filed 17 pages of medical records. ECF No. 3-1, 3-2. The Commissioner answered on November 22, 2022. ECF No. 8. In response to the Court's order, ECF No. 10, plaintiff and the Commissioner filed motions for summary judgment on January 24 and February 22, 2023, respectively. ECF Nos. 13, 14. The Commissioner filed a supporting memorandum with its motion, ECF No. 15. By letter to the Court, plaintiff filed a response to the Commissioner's motion. ECF No. 17. Oral argument is unnecessary, and this matter is ready for a decision.

## II.      BACKGROUND

### A.      *Background Information and Hearing Testimony by Plaintiff*

The ALJ held a hearing on December 2, 2021, at which plaintiff appeared by telephone and Edith Edwards, a vocational expert ("VE"), also testified.  R. 30–32.  The ALJ informed plaintiff of her right to representation and plaintiff indicated that she wished to proceed unrepresented.  R. 32–33.

Plaintiff testified that she lives with her 10-year-old twin sons, who are disabled and receiving social security benefits.  R. 36.  She testified that she cared for the boys by herself.  *Id.* During her days, plaintiff would prepare her sons for school and then do things around the house like washing clothes or dishes before sitting in one spot and going to sleep.  R. 45–46.  Plaintiff testified that she did the cooking, cleaning, and laundry, and that she cared for her Labrador Retriever including taking him for walks about six times a day.  R. 47–48.

Plaintiff earned an associate degree in 2008 to become a certified nursing assistant ("CNA").  R. 37, 39.  She worked full time as a CNA at a nursing home until February 24, 2020, when she quit working just before the COVID-19 pandemic forced everything to close.  R. 37–39.  Plaintiff said that she quit working because she could no longer support her children by herself and because her back was "constantly giving out" and "becoming locked," she fainted a "couple of times" at work, and she was exhausted physically and mentally.  R. 38–39.  When asked why she could not work, plaintiff testified that she had been having "chronic back pain," and that her back would "lock up" to the point of having to "drag [her] right side all the time."  R. 41.  She testified that she was mentally "broken down," that she was unable to take care of her kids by making them full meals, and that she would frequently "break down" and be in a "dark place."  *Id.*

3

When asked about treatment for her back, plaintiff testified that she had been seeing a pain management doctor, but that he retired, that she was looking for another doctor, and that she had been using patches to treat the pain. *Id.* Additionally, she testified that she learned from a couple of therapy sessions some techniques to treat her back at home, such as cold and warm compresses, walking, and working out to try to loosen up her back, but that it was too hard and painful. R. 42. She also testified that she takes Tylenol for pain, that she had been prescribed Meloxicam (a nonsteroidal anti-inflammatory drug[2]) and that she was also taking Gabapentin (an anticonvulsant[3]). R. 43. Plaintiff testified that her medical providers had not recommended surgery, but had recommended injections to treat the pain. R. 44. Plaintiff chose instead to treat her pain with patches because she was afraid of injection treatment. R. 44–45.

When asked about treatment for her mental health, plaintiff testified that she was regularly seeing Aubrey Smith, a mental health specialist from Genesis Counseling Center. R. 42. She testified that she was taking medications regularly, and that she felt they were effective initially but that the effectiveness would diminish over time and her doctors would "either up it or change it." *Id.* When asked if she had had any inpatient treatment, plaintiff testified that she was "doing online" and that she had never had an overnight admission. R. 45.

**B.    *Hearing Testimony by the Vocational Expert***

The VE testified, based on hypotheticals proposed by the ALJ and reflecting the ALJ's assessments of plaintiff's education, work experience, and residual functional capacity ("RFC"),

---

[2] *Meloxicam*, MedlinePlus, https://medlineplus.gov/druginfo/meds/a601242.html (last visited May 8, 2023). MedlinePlus is "a service of the National Library of Medicine," part of the National Institutes of Health. https://medlineplus.gov/ (last visited May 8, 2023).

[3] *Gabapentin*, MedlinePlus, https://medlineplus.gov/druginfo/meds/a694007.html (last visited May 8, 2023).

that plaintiff could not perform past work as a nurse assistant.  R. 50.  The VE testified that a person with plaintiff's profile[4] could perform work as a checker, a routing clerk, and a mailroom clerk.  R. 50–51.  The ALJ then asked about the general tolerance of these jobs for absences and off task behavior.  R. 52.  The VE testified that, in her opinion[5], an individual would be terminated for missing more than two days per month due to unexcused absences or for being consistently off task more than 10% of the workday.  *Id.*  After the VE finished testifying, and in response to the VE's assessment that plaintiff could perform mailroom clerk work, plaintiff objected that "sitting down for a period of time is a no-go also."  R. 52–53.

## C.   *Relevant Medical Record*

### 1.   *Treatment with Riverside Health System*

On January 24, 2020, plaintiff met with Edward M. Mendoza, M.D., complaining of vertigo and headaches.  R. 404–08.  Plaintiff reported that she had had headaches for years, and that she had experienced syncope (fainting, or passing out[6]) since her teenage years with intense pain.  R. 405.  She reported that her headaches had gotten worse over the years.  *Id.*  She reported

---

[4] The ALJ's full hypothetical—and the RFC that the ALJ eventually formulated—was an individual limited to light exertion, occasional climbing of ramps and stairs and occasional stooping, crouching, kneeling and crawling; who should never climb ladders, ropes or scaffolds; can balance on even surfaces, and stand and walk on level terrain; can tolerate occasional exposure to extreme heat or cold, humidity, vibration, respiratory irritants such as fumes, odors, dust, gases, poorly ventilated areas, flashing lights, very loud noises as defined in the Dictionary of Occupational Titles and hazards of unprotected heights and dangerous unguarded machinery; and who is limited to work requiring only occasional decision-making, occasional changes in work setting, occasional interaction with co-workers and supervisors, and no interaction with the general public.  R. 50–51; *see* R. 17.

[5] According to the VE, the "DOT" (Dictionary of Occupational Titles) did not discuss the issues of absenteeism and off-task behavior.  R. 52.

[6]   *Syncope*, National Institute of Neurological Disorders and Stroke, https://www.ninds.nih.gov/health-information/disorders/syncope (last visited May 8, 2023).

that she had begun having "daily chronic headaches," "sharp in nature with a throbbing component." *Id.* She also newly identified vertigo as an impairment. *Id.* After a neurologic examination, Dr. Mendoza assessed that plaintiff's "[r]ecent and remote memory, fund of knowledge, general appearance, language and attention span were grossly normal." R. 408. A motor examination "revealed normal power, tone, bulk and coordination in all four extremities." *Id.* Her "[r]eflexes were 2+ throughout and both plantar responses were flexor." *Id.* "Sensory examination was normal to light touch," with "vibratory and thermal sensations in all four extremities." *Id.* Plaintiff's gait was normal. *Id.* Her blood pressure was 120/80. *Id.* Dr. Mendoza assessed that a brain MRI done days before showed "no significant intracranial abnormality." *Id.* He prescribed Inderal (a brand name for propranolol, a beta blocker used to treat, among other things, migraine headaches[7]), increasing in dose from 10mg a week until plaintiff's headache symptoms were relieved, and instructed plaintiff to return to the clinic after two months to evaluate her therapy regimen. *Id.*

On February 3, 2020, plaintiff met with Hernani A. Valerio, M.D., her primary care provider, to address her blood pressure, anemia, mood problem, obesity, vitamin D deficiency, left-sided low back pain, migraine headaches, and spinning sensation, and to be screened for blood disease. R. 340–57. Dr. Valerio assessed plaintiff's vitamin D deficiency, depression, low-back pain with sciatica, and anemia as "currently stable and clinically doing well." R. 343. Plaintiff was advised to continue her medications for those ailments and call the office if she experienced side effects. *Id.* Plaintiff reported taking medication as needed for her back and tolerating medications without any side effects, and she denied any associated leg weakness or paralysis. R.

---

[7] *Propranolol*, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682607.html (last visited May 8, 2023).

352. Plaintiff's BMI was 40.66, and she was advised to continue to move more and eat less. R.
340, 343. Plaintiff's blood pressure was 130/90 and was "uncontrolled or above the target range,"
and plaintiff was advised to monitor her blood pressure three times a week and contact Dr. Valerio
if her blood pressure was "persistently above 140/90." R. 340, 343. Plaintiff's vertigo was listed
as "worsening" without additional comment or discussion of objective test results; she was advised
to continue her current medications and was referred to physical therapy. R. 343, 351. Plaintiff's
migraines were listed as "intermittent," and she was advised to keep a headache diary and record
her activities before and after symptoms occurred and to follow up with specialists. R. 344.

On February 5, 2020, plaintiff met with Cheryl Monroe, PT, after being referred by Dr.
Valerio to address her complaints of vertigo. R. 392–95. She reported passing out at work three
times a month, and that before passing out she would break into a sweat, have decreased hearing,
blurry vision, and tingling legs, be unable to speak clearly, and feel nauseous. R. 393. She reported
having dealt with dizziness for years. *Id.* Ms. Monroe reported that plaintiff did not present any
nystagmus with Dix Hallpike testing or during an oculomotor exam. R. 395. Plaintiff did not
report any increase in spinning or feeling lightheaded during the examinations. *Id.* Ms. Monroe
concluded that plaintiff's subjective symptoms were not related to "BPPV" (benign paroxysmal
positional vertigo). *Id.* A subsequent note by Dr. Valerio from February 5, 2020, stated that
plaintiff's clinical history was "compatible with vertigo," but that her physical therapy "assessment
and test" did "not fully support the diagnosis." R. 396. Dr. Valerio wrote that plaintiff's symptoms
might be part of migraine headache symptoms. *Id.*

On March 25, 2020, plaintiff met with Dr. Valerio, primarily to address her potential
hypertension. R. 382–90. Dr. Valerio noted that plaintiff was on iron pills for her anemia and that
she was tolerating medications without side effects. R. 384. Plaintiff reported becoming tired and

dizzy easily but denied any bleeding symptoms. *Id.* Dr. Valerio noted that plaintiff's vitamin D levels had been low in February 2019, but he did not note low levels for June 2019 or January 2020. *Id.* Plaintiff was tolerating medications for depression without any side effects. R. 384. Dr. Valerio assessed plaintiff's vitamin D deficiency, migraine headaches, anemia, vertigo, and depression all as "currently stable and clinically doing well." R. 388–89. Plaintiff reported taking ibuprofen and "medication as needed" for her low back pain and was tolerating medication without side effects. R. 384. Plaintiff's hypertension was "borderline high or elevation," and she was advised to monitor her blood pressure three times a week. R. 389.

On March 30, 2020, plaintiff met with Eric Obie, M.D., complaining of facial swelling and numbness around her left eye, blurred vision, a weak left jaw, discomfort in chewing, and loss of sensation in her right lip. R. 380; *see* R. 382. Plaintiff reported that she had cut her finger two days prior and then had numbness and tingling in her left face and difficulty closing her left eye. R. 380. Dr. Obie diagnosed plaintiff with Bell's palsy. R. 381. He prescribed a 13-day steroid regimen and instructed plaintiff to follow up with her primary care provider in 7–10 days. Plaintiff's condition was described as "stable" at discharge. *Id.* The record does not show that plaintiff sought additional treatment specifically for her Bell's palsy after this appointment with Dr. Obie.

Plaintiff met with Dr. Valerio on April 7, 2020. R. 373–79. Dr. Valerio assessed that plaintiff's anemia, vertigo, migraines, and Bell's palsy were "currently stable and clinically doing well." R. 377–78. Plaintiff was advised to continue with her medications for Bell's palsy (this was still within her 13-day steroid regimen) and call the office if experiencing any unwanted side effects. R. 378. Dr. Valerio proposed physical therapy as an option to address plaintiff's Bell's palsy, but plaintiff declined the therapy at that time. *Id.* Plaintiff's gait was normal. R. 377.

According to this treatment note, plaintiff's blood pressure was measured as 122/92 on April 7, 2020, 124/82 on March 30, 2020, and 134/82 on March 25, 2020. R. 374. Dr. Valerio assessed plaintiff's hypertension as "currently uncontrolled and above the target range," and noted that her goal blood pressure was "130/80 or less." R. 378. Plaintiff was advised to monitor her blood pressure at least three times per week and return to see Dr. Valerio promptly if her blood pressure was "persistently above 140/90." R. 373, 378. Plaintiff's vitamin D levels were not assessed.

On June 1, 2020, plaintiff met with Dr. Valerio, primarily to monitor her hypertension, but also to address her anemia, depression, and left wrist pain. R. 647–53. Her blood pressure was 136/88, her hypertension was assessed as "borderline high or elevation," and she was advised to continue monitoring her blood pressure. R. 648, 652. Plaintiff's anemia was listed as "currently stable and clinically doing well." R. 652. Her depression was listed as "currently uncontrolled or above the target range." *Id.* Regarding her depression, plaintiff was advised to continue with her current medications and call the office if she experienced any side effects. *Id.*

From July to October 2020, on referral from Dr. Valerio, plaintiff attended virtual physical therapy sessions to treat her lower back and left-sided sciatica. R. 691–730. Plaintiff's treatment plan was set at two sessions a week for 12 weeks. R. 730. Her first session was on July 29, 2020, and her last was on October 2, 2020 (nine weeks total). R. 726–29, 691–93. At her first session, plaintiff reported her pain level as 3/10. R. 728. Plaintiff's highest reported pain level was 7/10, for one session, on September 11, 2020. R. 706–07. She frequently reported pain levels of 0/10 (on August 18, 21, 25, 28 and September 1, 8, 18, 2020, *see* R. 691–730). At her last session, on October 2, 2020, plaintiff described her pain level as 0/10 and reported "feeling fine today [with] no issues." R. 692. After the session, Sean Hercules, PTA, noted that plaintiff "tolerate[d] skilled [physical therapy] session very well today stating she is having no issues at all today." R. 693.

Plaintiff was instructed to follow up with a doctor and planned to continue therapy if recommended. *Id.*

Plaintiff met with Glynis M. Davis, a nurse practitioner ("NP"), on October 19, 2020, complaining of chronic, left-sided low back pain with sciatica and seeking an initial neurosurgical evaluation. R. 683–87. Plaintiff reported that symptoms began approximately two years prior and complained of pain in her left low back that radiated down the back of her leg through her buttocks to her left foot. R. 683. She reported that her most bothersome actions were repetitive bending, prolonged walking, and standing. *Id.* She reported that she had attended physical therapy and although the therapy and medications helped, there had been "no prolonged benefit." *Id.* NP Davis observed that plaintiff was "[a]ble to stand from a seated position walk across room with normal gait," and "[a]ble to stand on [her] toes and heels with normal strength." R. 686. Plaintiff's spinal flexion was normal but "straightening increase[d] left low back discomfort." *Id.* A straight leg raise test was negative bilaterally. *Id.* Both hips moved well "without restriction or discomfort." *Id.* Distal proximal lower extremity strength was mostly "normal" and peripheral pulses were present. *Id.* Plaintiff had decreased sensation to pinprick in the dorsal aspect of her left foot and "mildly" diminished reflex in her left ankle. *Id.* She had no focal neurological deficit.[8] *Id.*

Plaintiff met with Dr. Valerio on October 28, 2020. R. 675–83. Plaintiff reported being uncomfortable with going to work because of a fear of passing out due to vertigo and chronic back pain. R. 677. She described her vertigo or dizziness as a "spinning and worse with movement."

---

[8] "A focal neurologic deficit is a problem with nerve, spinal cord, or brain function. It affects a specific location, such as the left side of the face, right arm, or even a small area such as the tongue. Speech, vision, and hearing problems are also considered focal neurological deficits." *Focal Neurologic Deficits*, MedlinePlus, https://medlineplus.gov/ency/article/003191.htm (last visited May 8, 2023).

*Id.* However, she reported that she had not fainted since February 2020. *Id.* Dr. Valerio assessed that plaintiff's vitamin D deficiency, migraine headaches, depression, anemia, and blood pressure were "currently stable and clinically doing well." R. 681–82. As to plaintiff's left-sided low back pain, Dr. Valerio wrote that it too was "currently stable and clinically doing well," and advised plaintiff to "continue to follow upon on future visits and do further testing or referral to specialty care as needed." R. 681. He noted that plaintiff's "straight leg testing" was negative. R. 680.

On February 26, 2021, plaintiff met with Dr. Valerio. R. 918–24. Plaintiff's blood pressure was 128/82. R. 918. Dr. Valerio noted no neurological abnormalities. R. 923. Dr. Valerio assessed that plaintiff's hypertension and vitamin D deficiency were "currently stable and clinically doing well." R. 923–24. Plaintiff's blood glucose levels were in the "borderline high or elevation" range. R. 923.

On April 28, 2021, plaintiff met with Raouf S. Gharbo, D.O., primarily for medication monitoring. R. 912–14. Plaintiff reporting feeling anxiety when out in public or driving her car. R. 912. She reported becoming overwhelmed in stores due to "overthinking and being too crowded." *Id.* She reported nausea and frequent migraines. *Id.* Her leg shook throughout the session and her fingers were fidgety. *Id.* On a physical examination, plaintiff's gait and station showed "no evidence of instability or balance disturbance." R. 913. Dr. Gharbo coached plaintiff on heart rate variability ("HRV") biofeedback skills and HRV monitoring devices to improve her pain and stress-coping skills.[9] R. 914. He also coached plaintiff on focused breathing techniques

---

[9] "HRV biofeedback involves receiving data on your heart rate from a device and then using breathing techniques to change your heart rate pattern." *Relaxation Techniques: What You Need to Know*, National Center for Complementary and Integrative Health, National Institutes of Health, https://www.nccih.nih.gov/health/relaxation-techniques-what-you-need-to-know (last visited May 8, 2023).

to mitigate persistent sympathetic activation and encouraged her to research online remote mindfulness training. *Id.*

On June 10, 2021, plaintiff met with John N. Livingstone II, M.D., complaining of ongoing headaches. R. 815–17. Plaintiff described "incredibly frequent predominantly throbbing" headaches associated with photophobia (light sensitivity[10]), phonophobia (sound sensitivity[11]), and osmophobia (smell sensitivity[12]) "without overt neurological features." R. 815. Plaintiff reported that she had been taking propranolol, which was of "great benefit," but that her prescription ran out and her headaches were "bad" again. *Id.* Plaintiff had "no recurrent syncope" (fainting or passing out). *Id.* Plaintiff's blood pressure was 146/98. R. 817. Dr. Livingstone completed a neurological examination of plaintiff and wrote that he saw "no reason for neuroimaging" at that time because plaintiff had had a "good response to low-dose immediate release propranolol." *Id.* He re-prescribed propranolol, advised plaintiff to keep a headache diary, advised plaintiff to take sumatriptan (an anti-migraine medication[13]) for headache abortive therapy, and instructed plaintiff to follow up in two to three months. *Id.*

On November 2, 2021, plaintiff spoke with Armida Risoldi, CMA, and Dr. Valerio by telephone. R. 794. The treatment note stated that plaintiff's blood glucose value as measured in

---

[10] *Photophobia*, MedlinePlus, https://medlineplus.gov/ency/article/003041.htm (last visited May 8, 2023).

[11] *Cyclic Vomiting Syndrome*, MedlinePlus, https://medlineplus.gov/genetics/condition/cyclic-vomiting-syndrome/ (last visited May 8, 2023).

[12] *Osmophobia*, Merriam-Webster, https://www.merriam-webster.com/dictionary/osmophobia (last visited May 8, 2023).

[13] *Sumatriptan*, MedlinePlus, https://medlineplus.gov/druginfo/meds/a601116.html (last visited May 8, 2023).

an October 28, 2021, test was in the diabetic range, at 6.5%.  *Id.*; *see* R. 835.  Plaintiff was prescribed Metformin (an anti-diabetic medication[14]) and advised to maintain a healthy diet and exercise regularly.  *Id.*

On November 4, 2021, plaintiff met with NP Rashi Harjai with a chief complaint of migraine headaches.  R. 791–94.  Plaintiff reported that she had "been doing well," and that the "intensity as well as the frequency" of her headaches had "decreased significantly."  R. 791.  She denied any new neurological issues.  *Id.*  She reported that in the one month prior, she had "only had 4–5 headaches," that her prescribed propranolol had "helped in reducing the frequency of the migraine headaches," and that her prescribed sumatriptan "aborted the headaches with reduce[d] intensity."  *Id.*  NP Harjai described plaintiff's migraines as "stable."  R. 793.  He encouraged plaintiff to continue with her current migraine medications, try over-the-counter migraine prevention supplements, hydrate adequately, keep a headache diary, and follow up with her primary care provider.  R. 793–94.  Plaintiff's blood pressure was 110/72.  R. 793.  Her gait was "stable."  *Id.*

## 2.    *Evaluation and Psychological Report from Genesis Counseling Center*

On May 13, 2020, Noelle Lowry, Ph.D., LCP, completed a psychological evaluation of plaintiff.  R. 627–31.  Dr. Lowry noted that plaintiff had been referred by her primary care provider for psychological testing in order to assist in treatment planning.  R. 627.  During the diagnostic interview, plaintiff indicated concerns regarding depressive symptoms, anger, irritability, withdrawal, and lethargy.  *Id.*  Plaintiff presented as alert, oriented, cooperative, and with adequate attention and concentration, and she maintained adequate rapport.  *Id.*  She was well-groomed, maintained appropriate eye contact and demonstrated appropriate ranges of affect.  *Id.*  Her mood

---

[14] *Metformin*, MedlinePlus, https://medlineplus.gov/druginfo/meds/a696005.html (last visited May 8, 2023).

was reported as euthymic, her thought processes and content were appropriate, and she demonstrated no evidence of hallucinations, delusions, or obsessions.  *Id.*  Dr. Lowry gave a diagnostic impression of persistent depressive disorder with anxious distress and intermittent major depressive episodes, social anxiety disorder (social phobia), and borderline personality disorder. R. 630.  However, Dr. Lowry concluded that plaintiff may have over-endorsed symptoms and provided "responses in an overly negative self-deprecating manner" on the MCMI-IV, as well as over-endorsed symptoms on the SCL-90-R.  R. 628.

### 3.      *Treatment with Genesis Counseling Center*

The record contains a treatment note for one session between plaintiff and Aubrey Smith, LPC on October 4, 2021.  R. 767.  That note indicates that plaintiff reported feeling empty inside, depression, irritability, anger, difficulty sleeping at night, and getting up and eating during the night but then not remembering it.  *Id.*  The note indicated diagnoses for moderate bipolar I disorder, social anxiety disorder (social phobia), and borderline personality disorder.  *Id.*  Plaintiff reported that "things [were] currently stable," that she found herself bored at home while her sons were at school, and that she "had been trying to work on herself more during this time."  *Id.*

### 4.      *EMGs and Medical Imaging of Plaintiff's Back*

An x-ray exam was done of plaintiff's lumbar spine on March 25, 2019.  R. 555–57.  Plaintiff's vertebral body heights showed no evidence of compression deformity, her intervertebral disk spaces were normal, her vertebral body alignment was within normal limits, and there was no evidence of fracture, dislocation, or subluxation.  *Id.*  The clinical impression was normal.  R. 557.

An x-ray exam was done on plaintiff's lumbar spine on October 11, 2019.  R. 515–18.  The interpreting physician found normal spinal alignment; "corticated irregularity of the L1 transverse process, possibly normal variant or healed sequela" but vertebral body heights and disc spaces that

appeared otherwise preserved; no significant degenerative change; no suspicious osseous finding; and no convincing pars defect[15]. R. 516–18. The clinical impression was "possible sequela of prior trauma," with "[n]o significant degenerative change." R. 518.

An MRI was done on plaintiff's spine on October 29, 2020. R. 1005–08; *see* R. 748–50. Plaintiff's conus medullaris (the base of the spinal cord[16]) demonstrated a normal signal and morphology; no infiltrative marrow signal was identified; no spondylolysis, spondylolisthesis or fracture was identified; paraspinal soft tissues were within normal limits; vertebrae T12–L4 showed no stenosis (narrowing in the spine[17]), L4–L5 showed a small central disc protrusion which caused no stenosis, and L5–S1 showed a small disc protrusion and mild bilateral facet arthropathy without stenosis. R. 1007–08. The interpreting physician's impression was mild degenerative disc disease with no significant stenosis. R. 1008.

An x-ray exam of plaintiff's lumbar spine was done on November 11, 2020. R. 1003–05, 1052. Plaintiff's alignment was "satisfactory." R. 1005. The x-ray results showed no disc disease spondylosis, or fractures, and minor facet arthropathy at L3/L4 through L5/S1. *Id.*

An EMG of plaintiff's left leg was done on December 1, 2020. R. 995, 1003, 1065. The EMG showed nonspecific findings in "multiple left L5/S1 muscles." R. 1065. However, there were "[n]o clear signs of a left lumbosacral motor radiculopathy, myopathy, motor neuron disorder

---

[15] "The pars interarticularis is a small, thin portion of the vertebra that connects the upper and lower facet joints," "the weakest portion of the vertebra." *Spondylolysis and Spondylolisthesis*, OrthoInfo, https://orthoinfo.aaos.org/en/diseases--conditions/spondylolysis-and-spondylolisthesis (last visited May 8, 2023).

[16] *Tethered Spinal Cord Syndrome*, National Institute of Neurological Disorders and Stroke, National Institutes of Health, https://www.ninds.nih.gov/health-information/disorders/tethered-spinal-cord-syndrome (last visited May 8, 2023).

[17] *Spinal Stenosis*, MedlinePlus, https://medlineplus.gov/spinalstenosis.html (last visited May 8, 2023).

or a large fiber polyneuropathy." *Id.*

An MRI was done on plaintiff's lumbar spine on December 4, 2020. R. 1001–03, 1050–51. The MRI "was completely normal," R. 1048, and did not "reveal any cause for [plaintiff's] current sciatic pain that could be remedied with surgery," R. 1050. The MRI revealed "no evidence of enhancing mass" associated which might be associated with a benign neoplasm. *Id.*; *see* R. 1001–02.

### 5. *State Agency Physician Reviews*

On June 30, 2020, William Rutherford, Jr., M.D., a state agency consultant, reviewed plaintiff's medical records and assessed her RFC. R. 63–65, 75–77. Dr. Rutherford assessed that plaintiff: (1) could, with normal breaks, stand or walk roughly 6 hours in an 8-hour work day; (2) could, with normal breaks, sit roughly 6 hours in an 8-hour work day; (3) could lift and carry 50 pounds occasionally and 25 pounds frequently; (4) could push or pull without restrictions, other than as to the total weight to be moved; (5) could frequently balance, stoop, kneel, crouch, and crawl; (6) could occasionally climb ramps, stairs, ladders, ropes, or scaffolds; and (7) had no manipulative, visual, communicative, or environmental limitations. R. 63–64, 76. Dr. Rutherford noted that plaintiff had not been hospitalized due to any issues associated with diagnosed vitamin deficiencies, hypertension, dizziness, or migraine headaches. R. 64, 76. He noted that plaintiff had "acceptable" imaging of her cervical (neck area) and lumbar spine, with "no significant findings," and that although plaintiff had reported back pain, imaging was "normal." R. 64, 76–77. He noted that plaintiff was "independent in daily activities" and "self-care," and that she cared independently for her two disabled sons. R. 64, 77. He opined that plaintiff was "reasonably capable of medium work." R. 64, 77.

16

As to plaintiff's mental health and impairments, Stephen P. Saxby, Ph.D., a state agency consultant, reviewed plaintiff's records and offered an assessment on June 30, 2020. R. 60–61, 72–73.   Dr. Saxby evaluated plaintiff under the criteria for the following listings:   12.04, depressive, bipolar, and related disorders; 12.06, anxiety and obsessive-compulsive disorders; and 12.08, personality and impulse-control disorders.   *Id.*   He opined that plaintiff's impairments pertaining to each of those listings was "non severe," and that a medically determinable impairment was present but that it did "not precisely satisfy the diagnostic criteria" for each of those listings.   *Id.*   He found that plaintiff had no limitations in her ability to understand, remember, or apply information or to adapt or manage herself, and that she had mild limitations in her ability to interact with others and to concentrate, persist, or maintain pace.   R. 61, 73.   He noted that plaintiff had never been hospitalized with mental illness and did not have any emergency room visits for decompensation or panic attacks; that a psychiatric evaluation from May 2020 provided "acceptable diagnoses for mental illness"; that plaintiff was capable of independent self-care and responsible for the care of her two sons; that plaintiff's concentration and thought content and processes were normal; and that there were "no significant limitations due to mental illness."   R. 61, 73.   Dr. Saxby concluded that the evidence did not establish the presence of any paragraph C criteria.   R. 61, 73.

On November 2, 2020, David Bristow, M.D., a state agency consultant, reviewed plaintiff's medical records at the reconsideration level and offered an assessment for an RFC similar to Dr. Rutherford's.   R. 95–97, 112–114.   The only differences are that Dr. Bristow assessed that plaintiff had no limitations on her ability to balance, and that she could occasionally (as opposed to frequently) stoop, kneel, crouch, and crawl.   R. 96–97, 112–14.

At the reconsideration level, Joseph Leizer, Ph.D., offered an assessment on November 2, 2020, as to plaintiff's mental health and impairments. R. 91–93, 108–110. Dr. Leizer evaluated plaintiff under the same listings as Dr. Saxby (12.04, 12.06 and 12.08). R. 92, 109. He opined, like Dr. Saxby did, that plaintiff's impairments pertaining to each of those listings was "non[-]severe," and that a medically determinable impairment was present but that it did "not precisely satisfy the diagnostic criteria" for each of those listings. R. 91–92, 108–09. Dr. Leizer noted plaintiff's ability to care for herself and her children and that she had never been hospitalized for mental illness. R. 92, 109. He noted that plaintiff's mental status exams "through treatment history" indicated "normal adequate concentration, normal thought content and processes, and no significant limitations due to mental illness." *Id.* He referenced an October 2020 exam that noted that plaintiff's "chronic depression [was] stable and clinically doing well" and was "non[-]severe." *Id.* Dr. Leizer concluded that the evidence did not establish the presence of any paragraph C criteria. *Id.*

### III.      THE ALJ'S DECISION

To evaluate plaintiff's claim of disability,[18] the ALJ followed the five-step analysis set forth in the Social Security Administration's ("SSA") regulations. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The ALJ considered whether plaintiff: (1) was engaged in substantial gainful activity ("SGA"); (2) had a severe impairment; (3) had an impairment that met or medically equaled a

---

[18] To qualify for disability insurance benefits, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and have a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a).   To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. *Id.*

condition within the SSA's listing of official impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) had an impairment that prevented her from performing any past relevant work in light of her RFC, and (5) had an impairment that prevented her from engaging in any substantial gainful employment. R. 13–24.

At step one, the ALJ found that plaintiff had engaged in SGA from February 24, 2019 (her alleged onset date), through February 24, 2020, but that there had been a continuous 12-month period after February 24, 2020, during which plaintiff did not engage in SGA. R. 13–14. At step two, the ALJ found that plaintiff had the following severe impairments: migraine headaches, lumbar spine disorder, obesity, anxiety/panic disorder, bipolar disorder, and borderline personality disorder. R. 14. The ALJ found that plaintiff's remaining medically determinable impairments— hypertension, vitamin D deficiency, dyslipidemia, anemia, diabetes, Bell's palsy, and vertigo— were non-severe because they were responsive to medication, did "not require any significant medical treatment," and/or did "not result in any continuous exertional or non-exertional functional limitations." R. 14–15. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the SSA's listed impairments. R. 15–17. The ALJ then determined plaintiff's RFC, R. 17–22, and proceeded to step four, where she determined based on that RFC that plaintiff was unable to perform any past relevant work, R. 22. Finally, at step five, the ALJ determined based on plaintiff's age, education, work experience, and RFC, along with the testimony of the VE, that there were jobs that existed in significant numbers in the national economy that plaintiff could perform. R. 22–23. Accordingly, the ALJ found that plaintiff was not disabled. R. 24.

## IV.    STANDARD OF REVIEW

In reviewing a disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supported the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek*, 139 S. Ct. at 1154 (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Johnson*, 434 F. 3d at 653. "'Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ].'" *Id.* (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Thus, reversing the denial of benefits is appropriate only if either (a) the record lacks substantial evidence supporting the ALJ's determination, or (b) the ALJ made an error of law. *Id.*

## V.    ANALYSIS

Pro se pleadings must be construed liberally. *Jackson v. Lightsey*, 775 F.3d 170, 177 (4th Cir. 2014). Pro se complaints are held to a less stringent standard than those drafted by attorneys.

*Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  Nonetheless, liberally construing a pro se complaint "does not mean that the court can ignore a clear failure in the pleading to allege facts which set forth a claim cognizable in a federal district court." *Carter v. Ervin*, No. 0:14-CV-00865, 2014 WL 2468351, at *2 (D.S.C. June 2, 2014) (citing *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990)).  A court's "task is not to discern the unexpressed intent of the plaintiff, but what the words in the complaint mean." *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006); *see also Weller*, 901 F.2d at 391 ("The special judicial solicitude with which a district court should view [] pro se complaints does not transform the court into an advocate.") (internal quotation marks omitted); *Beaudett v. City of Hampton*, 775 F.2d 1274, 1276 (4th Cir. 1985) (district courts cannot "be required to conjure up and decide issues never fairly presented to them").

Plaintiff does not identify any alleged legal or factual error with the ALJ's decision in either her complaint, memorandum in support of motion of summary judgment, or response to the Commissioner's motion for summary judgment.  Plaintiff also does not reference any portion of the ALJ's findings in any of her filings.  She does not point to any piece of evidence in the record. Instead, she restates her impairments and symptoms, and reasserts her inability to work. *See* Compl. 4; Pl.'s Mot. for Summ. J. 1, ECF No. 13; Pl.'s Resp. 2, ECF No. 17.  The Commissioner argues that the ALJ's decision is supported by substantial evidence.  Mem. of Law in Supp. of Def.'s Cross Mot. for Summ. J. 13–19, ECF No. 15.  Accordingly, the Court's review of the ALJ's decision will be limited to ensuring as a general matter that the "ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (internal quotations and citation omitted); *see Troy H. v. Kijakazi*, No. 3:22cv53, 2022 WL 17813714, at *2 (E.D. Va. Nov. 29, 2022), *report and recommendation adopted*, 2022 WL 17811389 (E.D. Va. Dec. 19, 2022) (despite the

claimant's failure to raise an error, the court would "nonetheless conduct a review of the record to ensure the ALJ made no clear error of law, and that substantial evidence supports the decision").

**A.      Step One**

Plaintiff alleges disability from February 24, 2019.  R. 11, 207.  The ALJ found that plaintiff had engaged in substantial gainful activity ("SGA") from February 24, 2019, through February 24, 2020, but that there had been a continuous 12-month period after February 24, 2020, during which plaintiff did not engage in SGA (step one).  R. 13–14.  In other words, the ALJ found that plaintiff was still engaging in SGA as of her alleged onset date and for a year afterward.  R. 14.

The ALJ supported this finding by reference to earnings documents that showed plaintiff's earnings up until early 2020 as exceeding the threshold for plaintiff to be considered as engaged in SGA.  R. 14 (citing R. 212, 216–22); *see* https://www.ssa.gov/oact/cola/sga.html (last visited May 8, 2023).  Plaintiff does not dispute the earnings numbers the ALJ referenced in her decision. Furthermore, plaintiff testified that she quit working on February 24, 2020.  R. 37.  The ALJ's finding that plaintiff was still engaging in SGA through February 24, 2020, is supported by substantial evidence.

**B.      Step Two**

The record substantiates the ALJ's finding that plaintiff's hypertension, vitamin D deficiency, and anemia were managed with medication and that these impairments produced no obvious and significant symptoms.  R. 14 (citing R. 373–79, 396–404, 676–83, 795–815, 821–28, 957–64).  Plaintiff's vitamin D deficiency and anemia were generally assessed as being stable and doing clinically well.  *E.g.*, R. 401–02 (Feb. 3, 2020, both vitamin D deficiency and anemia), 388–89 (Mar. 25, 2020, anemia), 377 (Apr. 7, 2020, anemia), 652 (June 1, 2020, anemia), 681–82 (Oct.

28, 2020, Vitamin D and anemia), 923 (Feb. 26, 2021, vitamin D). The record does not reveal any remarkable symptoms associated with either of those impairments.

As the ALJ noted, plaintiff's hypertension was not always controlled, but plaintiff's records do not show "more than minimal functional limitations" associated with that impairment. R. 14; *see, e.g.*, R. 378. Plaintiff was prescribed hydrochlorothiazide to treat her hypertension, but the hypertension was frequently assessed as borderline. *E.g.*, R. 408 (Jan. 24, 2020), 652 (June 1, 2020), 808 (Aug. 5, 2021). And, aside from hydrochlorothiazide, plaintiff was generally only advised to monitor her blood pressure regularly and report if her blood pressure was persistently above 140/90. *E.g.*, R. 426 (Oct. 11, 2019), R. 652 (June 1, 2020), 808 (Aug. 5, 2021). Also, her blood pressure levels were not consistently in the hypertension range. On October 28, 2020, for example, her blood pressure was 130/82 (the prehypertension range[19]) and on February 26, 2021, it was 128/82, and on both dates her hypertension was assessed by Dr. Valerio as "currently stable and clinically doing well." R. 676, 682, 918, 923. In November 2021, her blood pressure was 110/72, R. 793, in the normal range.

The ALJ correctly noted that plaintiff effectively had no history of treatment for diabetes. R. 15 (citing R. 794). Only in November 2021—approximately a month before her hearing with the ALJ—was plaintiff prescribed an anti-diabetic medication after her blood glucose level was shown to be in the diabetic range in October 2021.[20] R. 794–96; *see* R. 835 (glucose value of 6.5%). Plaintiff's other A1C tests showed her blood glucose values as in the prediabetic range or

---

[19] *High Blood Pressure Symptoms and Causes*, Centers for Disease Control and Prevention, https://www.cdc.gov/bloodpressure/about.htm (last visited May 8, 2023).

[20] *A1C*, MedlinePlus, https://medlineplus.gov/a1c.html (last visited May 8, 2023).

below, with no treatment prescribed. *See, e.g.*, R. 988 (Jan. 20, 2021, value of 6%), 842–43 (May 28, 2021, value of 6.3%).

As to plaintiff's Bell's palsy, the ALJ noted that it was newly assessed on March 30, 2020, but that plaintiff had not complained of similar symptoms since that incident. R. 15 (citing R. 373–381). The record corroborates that finding.

Finally, the ALJ correctly noted that no objective medical evidence established that plaintiff had vertigo. R. 15. As the ALJ explained, an impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Id.* (citing 20 C.F.R. §§ 404.1521, 416.921). "[A] physical or mental impairment must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. §§ 404.1521, 416.921. At no place in the record did diagnostic techniques support a diagnosis of vertigo. To the contrary, Dr. Valerio noted expressly in February 2020, that tests did not support a diagnosis of vertigo. R. 396. Also, in addition to the lack of objective medical evidence of vertigo, plaintiff reported on October 28, 2020, that she had not fainted since February 2020. R. 677. Plaintiff had "no recurrent syncope" in June 2021. R. 815.

Substantial evidence supports the ALJ's step two findings.

## C.     Step Three

### 1.     Plaintiff's Physical Impairments

As there is no specific listing for migraine headaches, the ALJ considered whether plaintiff's migraines met or medically equaled listing 11.02, epilepsy. R. 15 (citing SSR 19-4p ("Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of a primary headache disorder.")). In finding that they did not, the ALJ noted a lack of any detailed description in the record from acceptable medical sources of plaintiff's headache events. R. 15. The ALJ also

found that the record did not reflect that plaintiff's headaches resulted in a marked limitation in any area of functioning, and that records indicated that plaintiff had a "very good response to medication." *Id.* (citing R. 791). These findings are supported by substantial evidence. Dr. Valerio assessed in April and October 2020 that plaintiff's migraines were clinically doing well. R. 378, 681. In June 2021, Dr. Livingstone wrote that he saw "no reason for neuroimaging" at that time because plaintiff had had a "good response to low-dose immediate release propranolol." R. 817. Plaintiff reported in November 2021 that she had been doing well managing her migraines, that the "intensity as well as the frequency" of her headaches had decreased "significantly," that medication helped reduce the frequency of headaches, and that medication "aborted the headaches" and reduced their intensity. R. 791. It was reasonable for the ALJ to conclude that plaintiff's headaches did not result in a marked limitation in an area of functioning and that her headaches did not meet listing 11.02. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("We require at least one detailed description" of generalized tonic-clonic or dyscognitive seizures "from someone, preferably a medical professional, who has observed at least one of your typical seizures").

The ALJ evaluated plaintiff's back disorder against listing 1.15, "disorders of the skeletal spine resulting in compromise of a nerve root." R. 15–16; *see* https://www.ssa.gov/disability/professionals/bluebook/1.00-Musculoskeletal-Adult.htm#1_15 (last visited May 8, 2023). She found the listing was not met because there were no imaging findings "consistent with compromise of a nerve root in the lumbosacral spine." R. 15 (citing R. 515–18, 555–57, 748–50, 1050, 1052). She also found that there had been no documented medical need for a two-handed or one-handed assistive device, nor any evidence that plaintiff was unable to use "upper extremities to independently initiate, sustain, and complete work-related activities involving fine and gross movements." R. 15–16. The record substantiates these findings. A

25

physical impairment must be established by objective medical evidence from an acceptable medical source. In plaintiff's case, a lumbar spine x-ray was done in March 2019, and showed that vertebral heights were maintained with "no evidence of compression deformity," intervertebral disk spaces were maintained, the vertebral body alignment was within normal limits, and there was no evidence of fracture, dislocation, or subluxation. R. 556. An MRI done in October 2020 of plaintiff's lumbar spine showed "no infiltrative marrow signal," and no spondylolysis, spondylolisthesis, or fracture, and plaintiff's conus medullaris demonstrated a normal signal and morphology and her paraspinal soft tissues were within normal limits. R. 1007–08. X-ray results of plaintiff's lumbar spine from November 2020, showed that alignment was satisfactory, there was no disc disease, spondylosis, or fractures, and only minor facet arthropathy. R. 1052. An MRI on plaintiff's lumbar spine done in December 2020, was "completely normal" and "did not reveal any cause" for plaintiff's sciatic pain "that could be remedied with surgery." R. 1048, 1050. The ALJ cited all these results. R. 20. In the record, there is also no "documented medical need for an assistive device," or inability to use either upper extremity. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.15 (internal references omitted). Furthermore, as the ALJ noted, R. 20, plaintiff's straight leg raise tests were negative bilaterally, R. 686. A positive straight-leg raising test is necessary evidence of a "compromise of a nerve root of the lumbar spine." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A1 ("[W]e require a positive straight-leg raising test . . . in both supine and sitting positions appropriate to the specific lumbar nerve root that is compromised."). Finally, the ALJ credited the possibility that plaintiff's obesity could "reasonably exacerbate her back pain," but noted that plaintiff did not need an assistive device for ambulation and observations of her gait were unremarkable. R. 16. Thus, the ALJ concluded that plaintiff's obesity did not enhance the severity of her impairments to the extent that they met or equaled any listing. *Id.* The

record does reflect that plaintiff's gait was normal and that she did not need an assistive device for ambulation. R. 408 (normal gait, Jan. 24, 2020), 377 (normal gait, Apr. 7, 2020), 686 (normal gait, Oct. 19, 2020), 913 (normal gait, Apr. 28, 2021), 793 (stable gait, Nov. 4, 2021). And, plaintiff testified that she walked her dog several times daily. Accordingly, the ALJ's findings vis-à-vis plaintiff's back disorder were supported by substantial evidence.

### 2.    *Plaintiff's Mental Impairments*

Concerning plaintiff's limitations in understanding, remembering or applying information, the ALJ correctly noted that plaintiff had not alleged any significant issues with her memory or ability to follow instructions, reported any cognitive issues, or had any clinical history of impaired memory or cognition. R. 16. As to plaintiff's limitations in interacting with others, the ALJ recognized plaintiff's testimony that she becomes overwhelmed in stores, but also that plaintiff could do household shopping. R. 16. The ALJ noted that plaintiff had reported irritability and social anxiety, but correctly noted the lack of clinical observations of irritability or anxiety other than one instance of plaintiff's leg shaking and her fingers fidgeting at an appointment with Dr. Gharbo in April 2021. R. 16 (citing R. 912). The ALJ also noted that Dr. Valerio, plaintiff's primary care provider, "who prescribed the claimant's psychiatric medications, has only noted normal clinical signs and generally indicates that the claimant's conditions are stable." R. 16 (citations omitted); *see also* R. 20 (citations omitted). The record substantiates all these observations by the ALJ.

Furthermore, as the ALJ noted, although plaintiff has received at least some therapy for her mental impairments, the record contains only a single treatment note, from Genesis Counseling Center from October 2021. R. 20; *see* R. 767. That note gives no indication as to how many prior sessions plaintiff had or the course of plaintiff's treatment with Genesis; it lists diagnoses but does

not offer any assessments, and other than listing diagnoses the note primarily discusses plaintiff's self-reporting of her present symptoms. R. 767. The record also contains a single psychological evaluation, from Genesis Counseling Center from May 2020, and there the evaluator noted that plaintiff likely over-endorsed on multiple self-response exams. R. 628. The evaluator also noted that plaintiff maintained appropriate eye contact and demonstrated appropriate ranges of affect, had a euthymic mood, and had appropriate thought processes and content. R. 627. Despite the lack of clinical evidence of plaintiff's mental impairments, the ALJ nonetheless gave "some deference" to plaintiff's testimony and subjective reports in reaching her finding that plaintiff had a moderate limitation in adapting or managing oneself.

Substantial evidence supports the ALJ's finding that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.

### D.    *Plaintiff's RFC and Step Four*

The ALJ supported her findings as to plaintiff's RFC and functional restrictions and limitations with substantial reference to the record. R. 17–22. Consistent with regulations, the ALJ considered plaintiff's symptoms, and the extent to which plaintiff's symptoms were consistent with objective medical and other evidence. R. 17 (citing 20 C.F.R. §§ 404.1529, 416.929). The ALJ considered plaintiff's function reports and hearing testimony as to her daily activities, reasons for stopping employment, symptoms, and methods of treatment. R. 18–19. The ALJ then evaluated again the objective medication evidence in the record, including medical imaging, treatment records or lack of treatment records (such as those concerning mental impairments), and plaintiff's responsiveness to medications. R. 19–21. The ALJ then properly considered, without deferring to, medical opinions in the record and prior administrative medical findings (the findings of the state agency consultants). R. 21; *see* 20 C.F.R. §§ 404.1520c, 416.920c. And, the ALJ gave

some deference to plaintiff's subjective reporting and testimony pertaining to her symptoms. R. 21. The ALJ concluded that plaintiff's "statements concerning the intensity, persistence and limiting effects" of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record." R. 19; *e.g.*, R. 20 ("[I]maging of [plaintiff's] back is very inconsistent with the degree of pain she alleges. Imaging is also inconsistent with her reports of radicular pain, as there is no compressive pathology at all."). For the reasons already discussed above, substantial evidence supports that finding.

Having weighed plaintiff's claims against the evidence in the record, the ALJ then formulated plaintiff's RFC. Once the ALJ properly weighs all relevant evidence in the record, "the development of a claimant's RFC is solely within the province of the ALJ." *Kirkpatrick v. Kijakazi*, No. 1:20cv255, 2022 WL 392505, at *10 (W.D.N.C. Feb. 7, 2022) (citations omitted); *see* 20 C.F.R. §§ 404.1546(c), 416.946(c) (at the ALJ hearing, "the administrative law judge . . . is responsible for assessing your residual functional capacity."). It is not for the Court to second guess an RFC assessed by the ALJ after a proper review of record.

The Court finds no error in the ALJ's findings at step four.

### E.    *Step Five*

Finally, after concluding that plaintiff could not perform past relevant work, the ALJ considered the testimony from the VE about what jobs plaintiff could perform in the national economy and determined that the testimony was consistent with the information contained in the Dictionary of Occupational Titles. R. 23. The ALJ committed no error at this step. *See* 20 C.F.R. § 404.1566(e), 414.966(e) (the ALJ may use a VE to determine whether a claimant's work skills can be used in other work and the specific occupations in which they can be used).

In sum, the ALJ applied the correct legal standards and substantial evidence supports the ALJ's factual findings.

## VI.    RECOMMENDATION

For the foregoing reasons, the Court recommends that plaintiff's motion for summary judgment (ECF No. 13) be **DENIED**, the Commissioner's motion for summary judgment (ECF No. 14) be **GRANTED**.

## VII.    REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court

based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

 

 

_____
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
May 8, 2023